Madam Clerk, please call the next case. Thank you. 113-247, City of Calumet City v. Keith Embrey Counsel, you may proceed. Good morning, your honors. Michael Casey on behalf of the City of Calumet City. A September 2003 accident, September 2004 surgery, August of 2005 full duty return to work. After that full duty return to work, petitioner is laid off with a group of other individuals. After that layoff, he begins to come back to Dr. Mara. First in January of 2006, Mara who did the surgery says, I can't find anything wrong with you. Come back in three weeks. He comes back in March of 2006. Again, I can't find anything other than a mass on your scapula. The surgery had nothing to do with the scapula. So he recommends an MRI to look at that. Respondent, or rather petitioner, after that January 31, 2006 release again by Dr. Mara, no problems. Except for the scapula I see on your back, the mass I see on your scapula. The next action he takes is March 27, 2007 when he files an 8-8 petition to get the MRI for that scapula. So we have the doctor saying as of January 31, 2006, I find nothing to indicate that there's any problem with your shoulder. And petitioner waits until March 27, 2007 to file an 8, a petition under 8-8 seeking medical benefits. You've read the petition that he filed. And the MRI is done on April 26, 2007. And what does it show? What does Dr. Mara, after looking at it, say it shows? It shows nothing to do with the shoulder and the mass is gone. That mass that was on your shoulder blade is gone. So we're sitting back and we're saying, okay, well, we've got a guy that's released full duty, terminated with other employees, making these attempts to get back onto workers' compensation by saying that I've got something wrong with my shoulder. Dr. Mara totally doesn't support any of that. So with a clear MRI on April 26 of 2007, he comes back to Mara in May of 2007, and then again August of 2007, and again Mara says I can't find anything wrong. Your return is needed. It's not until July of 2009, when the evidence step of Dr. Mara is taken, that now respondent has some notice, well, there might be a causal connection for this ongoing subjective complaints of pain, because Mara says, I think, you know, there's, I don't think there's anything wrong, but I think I need to look again. That death is July 10 of 2009. And we ought, he's recommending an MR arthrogram. He's not recommending surgery at that point. The MR arthrogram is authorized and done in September of 2009. Doctor, we got some indication that there might be a need for additional treatment here. We sent him to an IME, very good one, Dr. Brian Cole. Can I comment on, you're giving us a very long, detailed history. You're challenging the second period of TTD when it commenced, correct? Yes. Isn't that what you're, and Dr. Mara gave, signed a prescription dated August 21st and states medium-level work restriction. 2007, yes. So the commission should have chosen November 22nd, 2010, which is the date of the claimant's second surgery, correct? That's correct. Okay. All right. So while that obviously could support a finding, I would concede that the second period of TTD would have commenced in November. It does not require the finding. It's a conflict in the evidence, is it not? Yes. Okay. So why did the commission go totally wrong in setting the restriction at August 21st, 2007? Because in August 21st of 2007, there is no request for TTD made. There's only 8A petitions asking for medical benefits. Indeed, the next petition that's filed only asks for medical benefits. When he filed the petition on October 22nd, 2010, he's not asking for TTD. He's asking for medical benefits. And when he filed those petitions asking for medical benefits, we, when we obtained sufficient medical evidence that there may be a causal connection here for ongoing medical treatment, we provided it. But there was never a request for TTD. It's a retroactive look back after the surgery saying, well, now look, ask for TTD all the way back. And, indeed, there was no off-work order until after the surgery. You, the commission, the court has indicated that and the commission has indicated that one can infer that there may be TTD if the nature of the, for example, the surgery suggests that it would be likely that he would be off-work, totally and temporarily disabled. That's why we consented to TTD beginning on the date of the surgery. So... So you consented to it then and the commission found that August 21st, 2007 was the date because that's the date that there is a medium-level work restriction. Right. But he did not ask for TTD and we don't have any indication... He never asked for TTD? And we don't have any indication that that's causally connected. You don't have any indication that that's causally connected? We don't have any indication that his off-work is causally connected to this 2004 surgery, 2003. This is now... Who's Dr. Cole? This is now four years after the accident, three years after the surgery. Who's Dr. Cole? Dr. Cole doesn't come in until 2010. Okay. And he says, as I examine you in 2010, it seems to me appropriate to take another look-see. That's how he put it. That's 2010. It looks here that Cole said that the condition necessitating the claimant's second surgery was causally related to the claimant's work-related injury. Your own expert provides a causal connection, doesn't he? Yes. Okay. So, as I indicated throughout the course of this proceeding, Petitioner has not been asking for TTD until the hearing date, until the date of the hearing. Counsel, try to control your nonverbal. It's distracting to the court. Thank you. Without any suggestion to us that there is an ongoing need for respondent to pay TTD for a causally related condition that has temporarily and totally disabled Petitioner from returning to work. It just isn't there. It has to be there at the same time it isn't there. It comes after a surgery, and then the off-work note, actually the first off-work note that I find in the record is January 6th of 2011 after the surgery. There are restrictions. There are, and these restrictions come significantly, in a significant period after the surgery, after continuing findings of nothing wrong, nothing wrong. And, as I said, we are sensitized. We are sensitized by the fact of that three. Well, we're going all over the place here. Your argument is a little hard to follow, to be candid about it. I'm trying to call out the essence of your argument. You raised the fact in the briefs, claimant was released as a part of the general layoff after he returned to work following the first period of TTD, correct? Correct. Is that relevant to anything here under interstate scaffolding? I think it's relevant in suggesting a motive. A motive on whose part? A motive on Petitioner's part to try and get back. Some kind of income. Okay. So we're sensitized to that. And what does he do when he files that March 27, 2007, 8A petition, and he's only asking for medical benefits, nothing? He attaches that suspect script, which he says is generated in 2006. Now, this is a good ñ more than a year after Dr. Morris found the scapular mass and said, I think we need an MRI. It's more than a year after that he files an 8A petition to get that. And he attaches this script that says something about, no, come back on March the 15th. It stated March the 10th. It says, come back on ñ Who was the purported author of the script? Dr. Mark. Why do you say it's suspect, then? Because it was issued in 2005, and Petitioner represented that it was issued in 2006. Was there a date on it? It was issued in 2005 before he returned to work full due, and Petitioner said it was generated as an office visit note in 2006. Did you cross-examine him on that? Pardon me? Did you cross-examine him on that? No, I did not. I did not cross-examine him. If it's so suspect, why did it go in without any questions? It's suspect because Petitioner's attorney is attaching it to a document and saying, we are entitled to ongoing workers' compensation benefits, and attaches a script that predates his full-duty return to work. So now we are sensitized to, well, what's going on here? You keep going back to the doctor, keep saying to the doctor there's something wrong. Doctor keeps telling you, I don't find anything wrong. Doctor does MRIs, doesn't find anything wrong. Doctor sends you home, I don't find anything wrong. And then you come back with this script saying, well, the doctor said that I have some limitations. He didn't. He said you had limitations before you went back to work full duty. So now we are highly sensitized to the whole course of what's going on here. And in light of that, we got Cole's opinion. With Cole's opinion, we authorized the surgery, and he's had that second surgery. I believe that no reasonable person would dispute that our conduct, first of all, that the evidence here demonstrates that Petitioner was entitled to TTD only from the date of the surgery, up until the date of hearing, and that our conduct throughout has been reasonable in light of the circumstances, and that penalties were not warranted under the facts and circumstances of the case. Thank you. Thank you, counsel. Counsel, you may respond. Good morning, Your Honors. My name is Michael Higgins. I am here on behalf of the Eppley. I apologize for any reactions that I had there, just passionate about my client. I'm here to tell you, as we all know, that a commission's finding should not be overturned just because different inferences can be drawn, the inferences that counsel tried to point out during his argument. We all know that this is a manifest weight standard, and in order for a finding to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent. So tell us succinctly, if you can, first of all, why the commission's determination on the second period of TTD was correct, as opposed to his argument that it should have been in November when the second surgery was authorized. After the commission made the decision that made this argument to the circuit court and now, Your Honors, I've questioned how there can be a clearly opposite conclusion when both the treating doctor and the IME doctor agree that the injured's complaints, the current complaints during the second period of TTD, are causally related to his original accident and valid. There's no opinion, there's no medical opinion to offer anything other than his complaints  are causally related. Kennedy was not entitled to return to work. He got TTD, the commission set the date in August of 2007, did they not? Correct. And you're asking me why did they set August? Yeah, what supports that determination? Okay. Because if you look at the commission's decision, they did modify the arbitrator's decision, and they said August 2007 because Dr. Marra had an office note on August 2007. He was a heavy mechanic by trade. Medium level does not meet the job requirements that his employer required him to do. So that's the answer. Yes. So, you know, I'm at a loss when I try to think why counsel is arguing that he's not entitled to TTD from that period through the date of arbitration. I mean, what medical evidence is he relying on? I basically want to keep my argument as simple as possible. His doctor says that the injury is related. His doctor says that he should be off and he should be getting paid TTD. Our doctor agrees. There's no medical evidence to suggest otherwise. And that's why I get passionate about this case, because there were so many delays. I mean, if you look at the facts, you can draw whatever inference you may want, but the facts are the facts. They're clear, plain, and indisputable. What about the penalties? Why should the penalties be upheld? Because let's look at the delays. You know, penalties should be awarded when there is vexatious and unreasonable delay by the employer to the injured worker. In counsel's argument, he gets up there and he concedes that in January of 2006 that there were problems and that Dr. Maher did order an MRI script. That MRI was not approved until May of 2007. That's a 16-month period. MRIs can be done in a week. An authorization, you know, if an insurance company wants to look at it and authorize it, okay, month, two months, but 16 months? That's completely vexatious and unreasonable. And let's look at the second MRI. The injured continues to report pain and no improvement. And Dr. Maher, in an October 2007 report, says that there's no improvement and he wants to see an MRI arthrogram to see what is really going on. Two years later, that is finally authorized. So now we've looked at two periods of failure to authorize. One for 16 months, one for 24 months. I mean, any logic would tell you that that is completely unreasonable. While the injured goes through the pain and the treatment that Dr. Maher wants to actually get down to the bottom of what's causing the pain. So finally, the MRI is done in September of 2009, and it shows that there's an actual tear in the labrum, which is connected to the original accident by both Dr. Maher and the treater. So that's October 2009. When does the employer finally decide to get an IME? April 26, 2010. We're still looking at about another seven-month period. As stated many times during this argument, Dr. Cole, their own doctor, agrees with Dr. Maher that this is related and he should be off work. As we know, the employer bears the burden of justifying the delay. So what is their sensible justification for the delay, which I'll ask counsel? I don't think they have a reasonable justification for the delay. And if you remember during counsel's argument, when you asked him three times who is Dr. Cole, he didn't even want to answer. Dr. Cole is his doctor. When your own doctor is telling you, look, here's the problem, this is what you've got to do, and you still fail to authorize everything, that's as vexatious and unreasonable as you can be. So the report from Dr. Cole came out in April 2010. The surgery still wasn't authorized for another seven or eight months. I mean, how can you possibly justify that? I don't think you can. And for that reason alone, we ask that you confirm the circuit court's findings.  Can I ask you a question? Sure, Your Honor. During this period of time where you allege the vexatious delay, did the employer refuse to pay any compensation? Yes, sir. Because, you know, counsel speaks about the 8A petition that was filed. That 8A petition was filed in conjunction with a 19B, and that was faxed to counsel with the off work note from Dr. Marra requesting TTD. And that was entered as an exhibit at trial. And that's why the arbitrator found that there was vexatious and unreasonable delay. Now, what did he award the penalties for, though? I'm sorry. Why were the penalties awarded? Basically because of the delay of the nonpayment of TTD and the delay of the authorization of treatment. But nonpayment of TTD was a component in the reason for the award of penalties. Is that correct? Am I right on that? I will look at the arbitrator's decision, if you don't mind. The first paragraph in the arbitrator's decision states that the arbitrator concludes Respondent is unreasonably and vexationally denied payment of Petitioner's TTD and medical benefits. Okay. And when he got to the 19K? Yes, under Section 19K and L. Okay. So it's also for nonpayment. The reason why I raise that is we have a case that says the Act only authorizes penalties for nonpayment of compensation. It does not authorize penalties for anything else. In fact, that's exactly what the Act says. But would you not agree that compensation can be found in the form of TTD and medical benefits? Well, TTD it can be. There's no question. It is compensation. Medical benefits would be nonpayment of the bill. Correct. Not the nonauthorization of the procedure. Because the Act specifically said in the case there has been an unreasonable vexatious delay of payment or underpayment of compensation. Then blah, blah, blah, blah, blah. Okay. Thank you, counsel. Thank you. Counsel may respond. Counsel points to the time between Dr. Marra's order for an MRI, which order came on January 31, 2006, when he found the mass on the scapula and says two years to get that done in May of 2007. That's unconscionable. Dr. Marra testified in his deposition when he gave that order on January 31, 2006, to get an MRI for the mass. He, I have no, I had no opinion on whether it was causally related. I had no opinion. That's in his, the transcript of his testimony. I didn't know anything about the shoulder or whether there was any condition in that shoulder that was causally related. That's what his testimony is. So counsel is suggesting that we should maybe anticipate what the doctor doesn't know or somehow figure out what the doctor doesn't know. But more importantly, when the MRI was done, off work, clear exams, but when the MRI was done two years later, it showed nothing. It took you two years to get an MRI that showed nothing, that showed that the mass on the scapula was gone, that when the doctor looked at it, he said you're clear, I can't find anything wrong with you, come back as needed. Two years to get an MRI that we thought was not related. That suggests to me, based upon what's in this record, it wasn't, there wasn't anything related. The mass had disappeared. The mass was gone. So, the, but perhaps even more telling is if there's this urgency to get it done, the depth of Dr. Marra isn't scheduled until July of 2009 by petitioner. And as I said, up to this point, there's no request for TTD. There's nothing pending. There's no, nobody has given us anything that suggests that TTD is due here. Thank you. Thank you, counsel, both for your arguments in this matter this morning. It will be taken under advisement with this position shall issue. Thank you, counsel.